*Gregory Johnson v. Maryland Department of Health*, No. 71, September Term, 2019. Opinion by Biran, J.


**STATUTORY INTERPRETATION – SEPARATION OF POWERS – HEALTH-GENERAL § 10-708(g)(3) – INVOLUNTARY MEDICATION OF PERSON FOUND INCOMPETENT TO STAND TRIAL –** The Court of Appeals held that, under Md. Code Ann., Health-General ("HG") § 10-708 (2019 Repl. Vol.), the Maryland Department of Health (the "Department") is authorized to involuntarily medicate an individual for the purpose of restoring competency to stand trial, provided the Department complies with requirements of due process. The Court also held that the General Assembly's placement of authority in the Department and an administrative law judge to decide whether to involuntarily medicate a person to restore competency is permissible under Maryland's separation of powers.

**CONSTITUTIONAL LAW – PROCEDURAL DUE PROCESS – INVOLUNTARY MEDICATION OF PERSON FOUND INCOMPETENT TO STAND TRIAL –** The Court of Appeals held that, while Petitioner has a significant liberty interest in avoiding unwanted psychiatric medication, the administrative process set forth in HG § 10-708 adequately mitigated the risk of erroneous deprivation of that interest. Petitioner availed himself of all the procedures provided in § 10-708. Thus, the Court held that the administrative law judge's order directing the Department to involuntarily medicate Petitioner to restore him to competency to stand trial did not deprive Petitioner of procedural due process.

IN THE COURT OF APPEALS

OF MARYLAND

No. 71

September Term, 2019

GREGORY JOHNSON

v.

MARYLAND DEPARTMENT OF HEALTH

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

Opinion by Biran, J.

Filed: August 24, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

After Gregory Johnson allegedly stabbed his neighbor, he was charged with attempted first-degree murder and related offenses. Prior to this incident, Mr. Johnson had an almost decade-long history of harboring irrational, persecutory beliefs. After receiving a competency evaluation of Mr. Johnson, a circuit court judge in Baltimore City found Mr. Johnson incompetent to stand trial and dangerous, and committed him for treatment to Clifton T. Perkins Hospital Center ("Perkins"), a State-run forensic psychiatric hospital in Howard County.

At Perkins, Mr. Johnson was diagnosed with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. After Mr. Johnson repeatedly refused to take antipsychotic medication that psychiatrists at Perkins prescribed for him, the Maryland Department of Health (the "Department") began the process under the applicable Maryland statute to administer the medication to Mr. Johnson involuntarily. A clinical review panel at Perkins determined that the prescribed medication was necessary, among other reasons, to restore Mr. Johnson to competency, and informed Mr. Johnson that the Department approved the administration of the medication to him for a period of 90 days. Mr. Johnson then exercised his right under statute to a *de novo* administrative hearing to review the panel's conclusion. After holding that hearing, an administrative law judge ("ALJ") ordered Mr. Johnson's involuntary medication to restore Mr. Johnson to competency. Mr. Johnson then sought judicial review of the ALJ's decision, and a circuit court judge upheld the ALJ's order.

Mr. Johnson argues that the Maryland statute governing involuntary medication does not authorize the Department to medicate a person for the purpose of competency restoration. Mr. Johnson also argues that, to the extent the statute does authorize

involuntary medication to restore competency through an administrative process, it violates Maryland's separation of powers and deprives Mr. Johnson of procedural due process. According to Mr. Johnson, when the Department seeks to forcibly medicate an individual for the purpose of restoring competency to stand trial, the decision to authorize such medication can only be made by the criminal trial judge after holding a hearing during which the defendant has the assistance of criminal defense counsel.

For the reasons discussed below, we hold that Maryland law authorizes involuntary medication to restore an individual's competence to stand trial, and does not violate separation of powers by entrusting an ALJ with the power to order such medication, subject to judicial review. Before the Department may infringe on a person's significant liberty interest in avoiding unwanted psychotropic drugs, the Department and an ALJ must comply with rigorous requirements of due process. Because the Department and the ALJ met these requirements in Mr. Johnson's case, we find no error in the order authorizing Mr. Johnson's involuntary medication.

# I

## Background

### A. Pertinent Statutory Provisions

1. Commitment Following a Finding of Incompetent to Stand Trial

A person accused of committing a crime is presumed competent to stand trial. *Wood v. State*, 436 Md. 276, 285 (2013). Title 3 of the Criminal Procedure Article governs the procedures a criminal trial court must use when a defendant's competence is called into question. If, before or during a trial, a defendant "appears to the court to be incompetent to

2

stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial." Md. Code Ann., Crim. Proc. ("CP") § 3-104(a) (2018 Repl. Vol.). "Incompetent to stand trial" (sometimes abbreviated in this opinion as "IST") means that the defendant is "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in [his or her] defense." *Id.* § 3-101(f).

> Under CP § 3-106(c)(1)(i):
>
> If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court shall order the defendant committed to the facility that the Health Department designates until the court finds that:
> > 1. the defendant no longer is incompetent to stand trial;
> > 2. the defendant no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others; or
> > 3. there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

The Department must report to the court whenever the Department believes that the defendant is no longer IST or no longer dangerous because of a mental disorder, or that there is not a substantial likelihood the defendant will become competent to stand trial in the foreseeable future. *Id.* § 3-108(a)(1)(ii). Whenever the Department makes such a report or otherwise provides the court with "opinions, facts, or circumstances that have not been previously presented to the court and are relevant to the determination" whether the defendant should remain committed, the court must hold a hearing within the next 10 business days to make such a determination. *Id.* § 3-106(d)(1)(iii). Regardless, the Department must provide the court with a report on the defendant's status every six months.

3

*Id.* § 3-108(a). A hearing to reassess the defendant's incompetence and dangerousness must be held at least annually, *id.* § 3-106(d)(1)(i), or upon the filing of a motion by the prosecutor or defense counsel setting forth new facts or circumstances that are relevant to the determination of continued commitment. *Id.* § 3-106(d)(1)(ii). In addition, the court may hold a conference to review the status of the defendant's commitment at any time on its own initiative. *Id.* § 3-106(d)(2).

2. Involuntary Medication Under the Health-General Article

The Health-General Article of the Maryland Code provides the process for involuntary administration of psychiatric medication to mentally ill individuals. Md. Code Ann., Health-General ("HG") § 10-708 (2019 Repl. Vol.). Absent an emergency, medication may not be administered to an individual who refuses it unless the individual was admitted to a hospital involuntarily,[1] or was "committed for treatment by order of a court," *id.* § 10-708(b)(2), including commitment following a finding of IST. In either scenario, a clinical review panel must approve the involuntary medication. *Id.*

A clinical review panel must consist of: (1) the clinical director of the facility's psychiatric unit (if the clinical director is a physician) or a physician designated by the clinical director; (2) a psychiatrist; and (3) a mental health professional other than a physician. *Id.* § 10-708(c)(1). A clinical review panel may approve the involuntary administration of medication prescribed by a psychiatrist to treat an individual's mental

---

[1] *See* HG §§ 10-614 – 10-617 (setting forth the process for involuntary hospitalization of a person due to a mental disorder).

4

disorder if the panel determines that the prescribing psychiatrist has exercised reasonable medical judgment and:

> Without the medication, the individual is at substantial risk of continued hospitalization because of:
>
>> (i) Remaining seriously mentally ill with no significant relief of the mental illness symptoms that:
>>
>>> 1. Cause the individual to be a danger to the individual or others while in the hospital;
>>> 2. Resulted in the individual being committed to a hospital under this title or Title 3 of the Criminal Procedure Article; or
>>> 3. Would cause the individual to be a danger to the individual or others if released from the hospital;
>>
>> (ii) Remaining seriously mentally ill for a significantly longer period of time with the mental illness symptoms that:
>>
>>> 1. Cause the individual to be a danger to the individual or to others while in the hospital;
>>> 2. Resulted in the individual being committed to a hospital under this title or Title 3 of the Criminal Procedure Article; or
>>> 3. Would cause the individual to be a danger to the individual or others if released from the hospital; or
>>
>> (iii) Relapsing into a condition in which the individual is unable to provide for the individual's essential human needs of health or safety.

*Id.* § 10-708(g)(3).

The individual whom the clinical review panel will consider medicating has the right to notice of when and where the panel will convene, *id.* § 10-708(e)(1)(i), the purpose of the panel, *id.* § 10-708(e)(1)(ii), and notice of the individual's rights before the panel, which include the right:

5

(i)    To attend the meeting of the panel, excluding the discussion conducted to arrive at a decision;

(ii)   To present information, including witnesses;

(iii)  To ask questions of any person presenting information to the panel;

(iv)   To request assistance from a lay advisor[2]; and

(v)    To be informed of:

    1. The name, address, and telephone number of the lay advisor;

    2. The individual's diagnosis; and

    3. An explanation of the clinical need for the medication or medications, including potential side effects, and material risks and benefits of taking or refusing the medication.

*Id.* §§ 10-708(e)(1)(iii) & (e)(2).

A clinical review panel must document its consideration of the issues and the basis for its decision on the administration of medication(s). *Id.* § 10-708(i)(1). To that end, the panel must provide a written decision to the individual, the individual's lay advisor, and the individual's treatment team. *Id.* § 10-708(i)(2). If the panel approves the administration of medication, the decision must specify, among other things, the medication or medications approved and the dosage and frequency range. *Id.* § 10-708(i)(3)(i). The written decision also must provide the individual with notice of the right to request a hearing before an ALJ from the Office of Administrative Hearings ("OAH"), as well as the right to request representation or assistance of a lawyer or other advocate at such a hearing.

---

[2] A "lay advisor" is defined under HG § 10-708 as "an individual at a facility, who is knowledgeable about mental health practice and who assists individuals with rights complaints." HG § 10-708(a)(2).

*Id.* § 10-708(i)(4). The lay advisor must assist the individual in connection with submitting a request for a hearing. *Id.* § 10-708(k).

A hearing before an ALJ is conducted *de novo* within seven days after the panel's decision, although a postponement of the hearing may be granted for good cause or if the parties agree. *Id.* §§ 10-708(l)(4), (l)(5) & (l)(6). The ALJ must state on the record the findings of fact and conclusions of law that support the ALJ's decision. *Id.* § 10-708(l)(8).

Within 14 days from the issuance of the ALJ's decision, either the individual or the facility may appeal the ALJ's decision to a circuit court. *Id.* § 10-708(m)(1). The circuit court must hear and issue a decision within seven calendar days from the date the appeal was filed. *Id.* § 10-708(m)(4). Further appellate review of the circuit court's decision is available to the Court of Special Appeals and/or this Court. *See* Md. Code Ann., State Gov't ("SG") § 10-223(b) (2014 Repl. Vol.); Md. Code Ann., Cts. & Jud. Proc. § 12-201 (2013 Repl. Vol.).

3. The *Allmond* Decision

In *Allmond v. Department of Health & Mental Hygiene*, 448 Md. 592 (2017), this Court considered a facial constitutional challenge to HG § 10-708. Gary Allmond was committed to Perkins after a criminal trial court found him incompetent to stand trial for first-degree murder. *Id.* at 601. Mr. Allmond presented with symptoms of serious mental illness, including paranoia, delusions, hallucinations, and disorganized thinking. *Id.* After Mr. Allmond refused to take prescribed psychotropic medications, a clinical review panel at Perkins convened to determine whether Mr. Allmond should be medicated against his will. *Id.* at 602-03. The clinical review panel ordered Mr. Allmond to be medicated for a

7

90-day period, and Mr. Allmond did not challenge that determination. After a reconvened panel approved the involuntary administration of the prescribed medications for another 90-day period, Mr. Allmond requested a hearing to review the reconvened panel's determination. After holding that hearing, an ALJ found that the continued administration of the medications was a reasonable exercise of professional judgment to treat Mr. Allmond's mental disorder. Contrary to the clinical review panel, the ALJ found that Mr. Allmond, who had obtained the highest level of patient privileges at Perkins, was not a danger to himself or others either within or outside the facility, despite his continuing mental illness. *Id.* at 602-04. However, the ALJ found that, without the continued administration of medications, Mr. Allmond would remain seriously mentally ill with no relief of the symptoms that had resulted in his commitment to the hospital. *Id.* at 604. Thus, the ALJ concluded that involuntary medication of Mr. Allmond was appropriate under HG §§ 10-708(g)(3)(i)(2) and (ii)(2). *Id.*

Mr. Allmond appealed to this Court, arguing that HG § 10-708(g), on its face, violates the guarantee of substantive due process under Article 24 of the Maryland Declaration of Rights by permitting forced medication without a showing of dangerousness in the facility. *Id.* at 596. We held that HG § 10-708 is not unconstitutional on its face. However, we explained that the authorization for involuntary medication will comply with substantive due process only where there is "a finding of overriding justification" for such medication, *id.* at 613 (quoting *Riggins v. Nevada*, 504 U.S. 127, 135 (1992)), such as the need to render a "detainee competent to stand trial for a serious crime," *id.*, and where there is a finding that involuntary medication is consistent with the four factors the Supreme

8

Court identified in *Sell v. United States*, 539 U.S. 166, 180 (2003): (1) important state interests are at stake; (2) involuntary medication will significantly further those state interests; (3) involuntary medication is necessary to further those interests; and (4) the administration of the prescribed drugs is medically appropriate, i.e., in the patient's best medical interest, in light of his or her medical condition. *Id.* at 612.

## B. Mr. Johnson's Arrest and IST Finding

Since approximately 2010, Mr. Johnson has believed that individuals are tracking, harassing, and stealing from him. In or about 2011, Mr. Johnson, then living in Baltimore County, believed that a neighbor was tracking his movements in Mr. Johnson's apartment, using heat sensors. After an altercation with that neighbor, Mr. Johnson was charged with second-degree assault in the District Court of Maryland sitting in Baltimore County. The court mandated that Mr. Johnson receive outpatient psychiatric treatment. Between 2011 and 2014, Mr. Johnson moved several times due to his belief that he was being harassed or tracked by unidentified individuals. Beginning in 2014, Mr. Johnson lived in an apartment building on Eutaw Place in Baltimore City.

For approximately a year leading up to May 2019, Mr. Johnson repeatedly accused one of his neighbors in the Eutaw Place building of breaking into his apartment to steal his clothes and television and to have sex with women. According to the neighbor, on May 15, 2019, Mr. Johnson aggressively confronted him near their apartment building's laundry facility and again accused him of stealing his clothes. The neighbor struck Mr. Johnson, who allegedly then produced a knife, stabbed the neighbor in the stomach and torso, and

9

fled. The neighbor was very seriously injured, requiring emergency surgery at the University of Maryland Shock Trauma Center.

Mr. Johnson was arrested and subsequently charged in the Circuit Court for Baltimore City with attempted first- and second-degree murder, first- and second-degree assault, openly carrying a dangerous weapon with intent to injure, and reckless endangerment.

On June 12, 2019, Mr. Johnson was transferred to Perkins for a pretrial competency evaluation. According to a treatment note concerning Mr. Johnson from July 3, 2019, Mr. Johnson "has some basic knowledge of [courtroom] proceedings, … but his paranoia gets in the way of him being competent to stand trial." Among other things, Mr. Johnson believed that

> in 2017 he noticed a neighbor was wearing Johnson's clothing. At this point, Johnson inspected his large wardrobe and found some pieces missing. Johnson began to look for and find evidence of break-ins. He came to believe that a specific neighbor had replaced his king size mattress with a nearly identical king size mattress that was slightly different. He also believed this neighbor switched his television with an identical television, tampered with the sunroof in his car, and was breaking into his apartment while he was at Church. At one point, Johnson claimed he found semen on his sofa and on his bed and subsequently became convinced the neighbor had broken[]in and had sex on his furniture. As such, Mr. Johnson began to skip Church. Johnson also suspected that all the neighbors around him knew that this specific neighbor was breaking[]in on a regular basis…. Johnson once suspected that the neighbor was monitoring his movements using an x-ray device; today, Johnson believes it is more likely that his neighbor had been using heat sensors to track his movements.

A treatment note from July 15, 2019 recounted that "[e]ven when the delusional nature of his beliefs [was] broached, Mr. Johnson remained incredulous and maintained that paranoia was 'heightened awareness' of his surroundings."

10

A Perkins forensic psychiatrist, Dr. Robinson,[3] provided a competency evaluation concerning Mr. Johnson to the criminal trial court. On July 17, 2019, the court found Mr. Johnson IST. The court committed Mr. Johnson to Perkins for treatment under CP § 3-106(c)(1)(i), thus necessarily finding that Mr. Johnson was a "danger to self or the person or property of another" because of a mental disorder.[4]

Back at Perkins, Mr. Johnson "incorporated … the hospital and staff into his delusional system," accusing them of having "surreptitiously given him psychotropic medications against his will" in place of his blood pressure medication. As detailed in his August 1, 2019 treatment note, Mr. Johnson's treating psychiatrist, Dr. Adam Brown, discussed with Mr. Johnson the improbability of his persecutory beliefs, but Mr. Johnson remained steadfast in those beliefs and "refused to consider that he might be exhibiting symptoms of mental illness," even when he had no other explanation to offer. For example, when asked why a neighbor would go to the trouble of using heat sensors to track Mr. Johnson, Mr. Johnson replied, "They exist don't they? So it's possible." However, Mr. Johnson was unable to explain why a neighbor would want to track him in such a manner. When Dr. Brown asked Mr. Johnson why someone would break into his residence and take his television, only to replace it with an identical television, Mr. Johnson responded by stating that Dr. Brown "did not understand how things were in the 'ghetto,' and alleged

---

[3] Dr. Robinson's first name is not contained in the record.

[4] The transcript of the competency hearing in Mr. Johnson's criminal case is not contained in the record of this case. Mr. Johnson does not dispute that he was properly committed to Perkins following the criminal trial court's finding that he was IST.

11

that this was a common occurrence." Mr. Johnson was unable to understand why a third party might consider his beliefs to be delusional. Although Mr. Johnson was not physically violent in the hospital and did not require restraints or emergency medication, he was irritable and, on at least two occasions, verbally abusive of Perkins's staff. He obtained "bronze" privileges at Perkins in the six weeks following his commitment, meaning that he required an escort to go anywhere in the hospital outside of his maximum-security ward.[5]

Dr. Brown diagnosed Mr. Johnson with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. After Mr. Johnson was prescribed a nightly five milligram dose of Haloperidol, an antipsychotic medication, he informed Perkins staff that "he had 'no intention of taking psych medication' and referenced his 'intellectual abilities' and 'knowing' he has 'always been competent.'" On August 14, 2019, Mr. Johnson continued to refuse all antipsychotic medications. The treatment note from August 14 recounts that Mr. Johnson "believes we (his treatment team) are responsible for him still being in the hospital. He continues to believe this despite education on multiple occasions that he is hospitalized due to an order from the court. He insinuates that we are keeping him hospitalized for a nefarious purpose." Toward the end of the August 14 treatment meeting, Dr. Brown informed Mr. Johnson that Perkins would be convening a clinical review panel

---

[5] Bronze privilege is one level above "restricted" status, and below the silver, gold, and platinum levels of privilege. At the higher privilege levels, patients are given more freedom within the facility, for example, being permitted to watch television in a room on their own.

to pursue approval to treat his mental illness and restore him to competency through the involuntary administration of the prescribed medication.

## C. Clinical Review Panel

On August 14, 2019, the Department provided a written Notice of Clinical Review Panel to Mr. Johnson, informing him of the Department's intent to convene a clinical review panel under HG § 10-708. The notice stated that the panel would convene at Perkins at 1:00 p.m. on the following day, August 15, 2019, to determine "whether psychiatric medication(s) shall be given to you despite your refusal." The notice also advised Mr. Johnson of his various rights in connection with the panel.

The panel convened on August 15, 2019. In addition to Mr. Johnson and the three members of the panel, the other people present were Dr. Brown, Dr. Zaw Htwe (another treating psychiatrist on the ward where Mr. Johnson was housed), and Jerry Willis, who served as the "lay advisor" provided to Mr. Johnson under HG § 10-708(e)(2)(iv).[6]

Dr. Brown presented the argument as to why Mr. Johnson required the involuntary administration of medication, specifically Haloperidol and Benztropine (the latter being used to treat side effects of antipsychotic drugs such as Haloperidol). Dr. Brown provided the panel with Mr. Johnson's clinical history and a description of his current symptoms, opining that Mr. Johnson "demonstrated evidence of considerable paranoia and has labored under the influence of persecutory delusions surrounding his neighbor and his circumstances during the year prior to the offense." Dr. Brown further explained that Mr.

---

[6] In the panel's written decision concerning Mr. Johnson's case, Mr. Willis is referred to as a "Rights Advisor."

13

Johnson "was prescribed Haloperidol 5 mg at bedtime, but he refused to take it and has not accepted a single dose of psychotropic medication since his admission. He does not believe that he has a mental illness and has poor insight into his persecutory beliefs." Dr. Brown "clearly indicated [Mr. Johnson's] psychiatric problems – including irritability, paranoia, and persecutory delusional beliefs are not likely to resolve without treatment with antipsychotic medication." Dr. Brown also opined that Mr. Johnson "is not likely to be restored to competency to stand trial without antipsychotic medication."

Mr. Johnson spoke on his own behalf, confirming his belief that a neighbor had harassed him, including by taking his king size bed and television and replacing them with nearly identical items. Mr. Johnson stated that he did not need psychiatric medication because he believed he was telling the truth.

In the written Decision of Clinical Review Panel, the panel affirmed Dr. Brown's diagnosis that Mr. Johnson suffered from Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, based on his "paranoia, persecutory delusions, frequent irritability, verbal hostility, lack of insight into illness, [and] poor judgment." The panel determined that Mr. Johnson's disorder "is a biological condition and other modalities, including therapy are ineffective. Medications are medically necessary and appropriate to treat [Mr. Johnson's] mental illness and to restore him to competency." The panel also informed Mr. Johnson of its findings that, without the medications prescribed by Dr. Brown, Mr. Johnson was at substantial risk of continued hospitalization due to remaining seriously mentally ill with no significant relief of, and for a significantly longer period of time with, the mental illness symptoms that: "[c]ause you to be a danger to yourself or others while in the

14

hospital; [r]esulted in your being committed to the hospital under Title 10 of the Health-General Article or Title 3 of the Criminal Procedure Article; or [w]ould cause you to be a danger to yourself or others if released from the hospital."

The panel concluded that no alternative treatments were acceptable to both Mr. Johnson and his treating physician, and that giving the recommended medications represented a reasonable exercise of professional judgment. The panel approved the involuntary administration of Haloperidol and Benztropine (or alternate medications suggested by the panel) to Mr. Johnson for a period of up to 90 days.

In accordance with HG § 10-708(i)(4), the panel advised Mr. Johnson of his right to request a hearing before an ALJ, and further advised him that he had the right to request representation or assistance at such a hearing. The panel also informed Mr. Johnson that his rights advisor would assist him in securing representation or assistance at a hearing, and also provided Mr. Johnson with contact information for a legal assistance provider and a lawyer referral service.

## D. Administrative Hearing Before the ALJ

Following Mr. Johnson's receipt of the Decision of Clinical Review Panel, Mr. Johnson invoked his right to a hearing and requested that the State provide him with legal representation at no cost to him. Mr. Johnson was informed that the administrative hearing would be scheduled within seven days of the panel's decision, and that the hearing may be postponed by agreement of the parties or for good cause shown.

After a one-week postponement,[7] an attorney from Disability Rights Maryland represented Mr. Johnson at a *de novo* hearing before an ALJ from the Office of Administrative Hearings, on August 29, 2019. Mr. Johnson's counsel introduced Perkins's Individual Treatment Plan for Mr. Johnson (which contained the treatment notes discussed above) as an exhibit. The Department introduced several other exhibits, including the Decision of Clinical Review Panel.

The Department presented its case primarily though the testimony of Dr. Brown, whom the ALJ accepted as an expert in general psychiatry and forensic psychiatry. Dr. Brown explained Mr. Johnson's diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, the lack of alternative treatment options, and the panel's decision to medicate Mr. Johnson. Dr. Brown identified delusions as Mr. Johnson's most prevalent symptom and traced the history of his delusions going back to approximately 2010.

Dr. Brown opined that antipsychotic medication was necessary to treat Mr. Johnson's psychotic symptoms, particularly delusions, and to restore his competency to stand trial. Dr. Brown further opined that any side effects of the medications likely would not significantly interfere with Mr. Johnson's ability to assist his defense counsel. Dr. Brown opined that, without the prescribed medications, Mr. Johnson was at substantial risk of remaining seriously mentally ill with no significant relief of, and for a significantly longer period of time with, the mental illness symptoms that cause him to be a danger to himself or others while in the hospital; resulted in his being committed to the hospital as

---

[7] The record does not indicate the reason for the postponement.

IST; and would cause him to be a danger to himself or others if released from the hospital. Dr. Brown further opined that the administration of the prescribed medications represented a reasonable exercise of professional judgment and, based on average treatment time in literature, would cause improvement in approximately 70 days.

Mr. Johnson's counsel cross-examined Dr. Brown. At one point, Mr. Johnson's counsel elicited from Dr. Brown that Mr. Johnson's "delusions have remained" throughout his course of treatment. The following exchange then occurred:

COUNSEL: Okay. And, for that reason, it's your opinion that even today Mr. Johnson remains not competent to stand trial?

DR. BROWN: Correct.

COUNSEL: Because if he were competent, we wouldn't be here today?

DR. BROWN: He – he wouldn't be in the hospital. I mean –

COUNSEL: Right. And if you have found him – if you – I mean, he could be in the hospital if he was competent, right?

DR. BROWN: Yeah, he could be.

COUNSEL: Because competency is fluid, correct?

DR. BROWN: Correct.

COUNSEL: So, someone could come in not competent and then, you know, they can be restored to competency?

DR. BROWN: Sure.

COUNSEL: So, if it was your opinion that he had been restored to competency we wouldn't be here … , correct?

DR. BROWN: Correct.

17

After the Department concluded its presentation, Mr. Johnson's counsel moved to strike Dr. Brown's testimony concerning restoration of competency through forcible medication. Mr. Johnson's counsel argued that, because the ALJ lacked jurisdiction to decide whether Mr. Johnson remained incompetent to stand trial, Mr. Johnson was "precluded from raising the most obvious affirmative defense to competency restoration, which is the fact that he is competent." The following exchange then occurred between the ALJ and counsel for Mr. Johnson:

ALJ: Why hasn't Mr. Johnson filed some kind of motion with the circuit court to have his competency re-evaluated? If you're saying that he's competent, why hasn't he moved for that? There's been an official court order determining … that he is incompetent… [I]nstead of challenging it here, why doesn't he challenge it in the appropriate forum of the circuit court?

COUNSEL: Well, your Honor, he could do that….

ALJ: Okay. I'm going to overrule the objection.

COUNSEL: Okay.

ALJ: You just said all you need to say.

COUNSEL: I'm just going to – this proceeding is separate and apart from his criminal case.

ALJ: Understood…. [W]e can't talk about competency here, but he has the opportunity to say that he's competent in another forum. He's chosen not to do it. So, I have to accept the … ruling of the circuit court which is that he is incompetent.

After hearing closing arguments, the ALJ found that the Department had shown all the requirements for an order of involuntary medication under HG § 10-708. As pertinent here, the ALJ found that, without administration of the medications, Mr. Johnson was at a

18

substantial risk of continued hospitalization due to remaining seriously mentally ill with no significant relief of, and for a significantly longer period time with, the mental health symptoms that: (1) resulted in Mr. Johnson being committed under Title 3 of the Criminal Procedure Article; and (2) would cause Mr. Johnson to be a danger to himself or others if released from the hospital. The ALJ did not find that Mr. Johnson was a danger to himself or others within Perkins without the prescribed medications.

The ALJ then considered whether the involuntary administration of medication to Mr. Johnson would violate Mr. Johnson's right to substantive due process, applying the four-part test set forth in *Sell v. United States*, which this Court adopted in *Allmond*. The ALJ found by clear and convincing evidence that the State had shown: (1) it has an important interest in prosecuting Mr. Johnson for the serious crimes with which he is charged, including attempted murder; (2) involuntary medication of Mr. Johnson will further this State interest by enabling Mr. Johnson to become competent to stand trial; (3) involuntary medication is necessary to further this interest; that is, there are no less intrusive alternatives to involuntary medication that would allow the State to bring Mr. Johnson to trial; and (4) administration of drugs is medically appropriate in light of Mr. Johnson's medical condition. Finally, citing *Allmond*, the ALJ found that restoring Mr. Johnson to competency provided an "overriding justification" for his involuntary medication.

The ALJ issued a written order on August 29, 2019, approving the Department's administration of the prescribed antipsychotic medications to Mr. Johnson for up to 90 days.

19

**E. Judicial Review**

On September 4, 2019, Mr. Johnson filed a petition for judicial review of the ALJ's decision in the Circuit Court for Howard County, where Perkins is located. The circuit court held a hearing on Mr. Johnson's petition on September 25, 2019. Mr. Johnson contended that HG § 10-708 does not authorize the ALJ to order involuntary medication for the purpose of restoration of competence to stand trial. In addition, Mr. Johnson argued that HG § 10-708 deprives him of procedural due process. Finally, Mr. Johnson claimed that the Department failed to meet its burden by clear and convincing evidence under the *Sell* four-part test. On September 29, 2019, the circuit court entered an Order denying Mr. Johnson's petition and affirming the ALJ's decision. The court found substantial evidence in the record to support the ALJ's decision and held that the ALJ had not made any errors of law.

Following the circuit court's decision, Mr. Johnson noted an appeal to the Court of Special Appeals. On December 16, 2019, before the Court of Special Appeals decided his appeal, Mr. Johnson filed with this Court a verified motion for injunctive relief and a petition for writ of *certiorari*.[8] On February 11, 2020, we granted Mr. Johnson's *certiorari* petition, *Johnson v. Maryland Dep't of Health*, 467 Md. 263 (2020), and denied his motion for injunctive relief. In granting *certiorari*, we agreed to review the following questions:

---

[8] In his petition, Mr. Johnson did not seek further review of the ALJ's application of the *Sell* factors or otherwise challenge the order of involuntary medication on substantive due process grounds.

20

1. Did Respondent impermissibly decide issues of competency in violation of the U.S. Constitution and the Maryland Declaration of Rights when it used an administrative process to forcibly medicate Petitioner for competency restoration based on a statute that omits language authorizing involuntary medication for that purpose?

2. Did Respondent violate the U.S. Constitution and Maryland Declaration of Rights, which guarantee a criminal defendant certain due process and trial rights, when it forcibly medicated Petitioner after an administrative proceeding that prohibited him from asserting affirmative defenses related to his competency to rebut Respondent's case and denied him meaningful access to his criminal defense attorney?[9]

## II

### Standard of Review

"In a case concerning the merits of a final administrative agency decision – such as that of the ALJ in this case – we review directly the administrative decision, not the decisions of the courts that previously reviewed the agency decision before it came to us." *Allmond*, 448 Md. at 608. We review the ALJ's findings of fact under the substantial evidence test, which is deferential to the administrative determination. *See id*. We review the ALJ's conclusions of law without special deference. *Id.*

---

[9] In his motion for injunctive relief, Mr. Johnson reported that the Department reconvened a clinical review panel on November 13, 2019. That panel did not recommend involuntary medication for Mr. Johnson, finding that he had "agreed to take medications voluntarily." The panel reserved the right to reconvene if Mr. Johnson refused to take his prescribed medication "in the future." According to Mr. Johnson's motion for injunctive relief, the second panel "misinterpreted the meaning of Mr. Johnson's statements" during the panel meeting, and Mr. Johnson in fact refused to take the prescribed medications after the second clinical review panel concluded. We are not aware of the Department having convened another clinical review panel regarding Mr. Johnson after the November 13, 2019 panel. The Department has not argued for any reason that either of the questions we agreed to review is moot, nor do we see any basis to reach that conclusion.

## Discussion

In arguing for reversal of the ALJ's decision to approve his involuntary medication, Mr. Johnson first contends that the Department and the ALJ exceeded their authority because: (1) HG § 10-708 does not permit involuntary medication for the purpose of restoring a person to competency to stand trial; and (2) both the Department and the ALJ necessarily decided the question of Mr. Johnson's competence to stand trial, in violation of Maryland's separation of powers mandated by Article 8 of the Declaration of Rights. Second, Mr. Johnson claims that, to the extent HG § 10-708 authorizes involuntary medication to restore competency, the administrative process set forth in § 10-708 deprived him of procedural due process because it created an intolerably high risk of an erroneous deprivation of his interest in avoiding unwanted psychiatric medication. As discussed below, we conclude that Mr. Johnson's claims lack merit.

**A. Under Maryland Law, the Department or an ALJ May Approve Involuntary Medication to Restore Competency to Stand Trial.**

1. HG § 10-708 Authorizes the Department to Involuntarily Medicate a Person to Restore the Person to Competency to Stand Trial on Criminal Charges.

When we interpret a statute, our goal is to ascertain and effectuate the actual intent of the General Assembly. *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). We begin this inquiry by examining the plain meaning of the statutory language. *Agnew v. State*, 461 Md. 672, 679 (2018). If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry ordinarily comes to an end, and we apply the statute as written, without resort to other rules of construction. *Lockshin*, 412 Md. at 275.

22

However, we do not analyze statutory language in a vacuum. *Matter of Collins*, 468 Md. 672, 689-90 (2020). "Rather, statutory language 'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *Id.* (quoting *Lockshin*, 412 Md. at 276).

"Where the statutory language is subject to more than one reasonable interpretation, or its meaning is not clear when considered in conjunction with other statutory provisions, we may glean the legislative intent from external sources." *In re R.S.*, 470 Md. 380, 2020 WL 4744912, at *9 (Aug. 17, 2020) (internal quotation marks and citation omitted). "Whether the statutory language is clear or ambiguous, it is useful to review the legislative history of the statute to confirm that interpretation and to eliminate another version of the legislative intent alleged to be latent in the language." *Id.* (cleaned up).

We presume that the Legislature intends its enactments to operate "as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Lockshin*, 412 Md. at 276. Relatedly, we interpret "the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Johnson v. State*, 467 Md. 362, 372 (2020) (quoting *Phillips v. State*, 451 Md. 180, 196-97 (2017)).

"Finally, consideration of the consequences of alternative interpretations of the statute grounds the analysis." *In re O.P.*, 470 Md. 225, 2020 WL 4726601, at *13 (Aug. 14, 2020). In each case, we must give the statute in question a reasonable interpretation, "not one that is absurd, illogical, or incompatible with common sense." *Lockshin*, 412 Md. at 276.

23

Mr. Johnson argues that, in enacting HG § 10-708, the General Assembly evinced its intent not to authorize the Department to involuntarily medicate individuals for the purpose of restoring them to competency to stand trial.[10] Mr. Johnson primarily reaches this conclusion through analysis of the language of HG §§ 10-708(g)(3)(i) and (ii). These subsections allow a clinical review panel to approve involuntary medication of an individual if the panel determines (among other things) that, without the medication, the individual is at substantial risk of continued hospitalization due to remaining seriously mentally ill with no significant relief of, or for a significantly longer period of time with, the mental health symptoms that:

1. Cause the individual to be a danger to the individual or others while in the hospital;
2. Resulted in the individual being committed to a hospital under this title or Title 3 of the Criminal Procedure Article; or
3. Would cause the individual to be a danger to the individual or others if released from the hospital.

HG §§ 10-708(g)(3)(i) & (ii).

Although Mr. Johnson acknowledges that §§ 10-708(g)(3)(i)(2) and (ii)(2) both contemplate the Department may seek to involuntarily medicate a person who is committed to a hospital following a finding of IST, he argues that §§ 10-708(g)(3)(i)(2) and (ii)(2) permit the Department to involuntarily medicate such a person only if he or she is found to

---

[10] In *Allmond*, we did not consider the argument Mr. Johnson presents to us concerning the General Assembly's intent in enacting HG § 10-708. Thus, while *Allmond* stands for the proposition that § 10-708 may be applied to restore an individual to competency without violating the individual's right to substantive due process, it does not necessarily follow that the General Assembly intends for the statute to apply to such a situation. Similarly, *Allmond* does not dispose of Mr. Johnson's arguments concerning separation of powers and procedural due process.

be presently dangerous in the facility. Mr. Johnson reaches this conclusion by focusing on the statutory language that directs the Department or an ALJ to consider "the mental illness *symptoms* that … *resulted* in the individual being committed under this title or Title 3 of the Criminal Procedure Article." HG §§ 10-708(g)(3)(i)(2) and (ii)(2) (emphasis added). As Mr. Johnson points out, commitment under Title 3 (or under pertinent provisions elsewhere in Title 10 of the Health-General Article) only results when, in addition to any other required findings, the trier of fact finds that the person in question is presently a danger to self or the person of another (or, in some cases, the property of another). *See* HG § 10-632(e)(2)(iii) (civil commitment statute); CP § 3-106(c)(1)(i) (commitment after finding of IST); *id.* §§ 3-112(b), (g) (commitment after verdict of not criminally responsible). Thus, a criminal trial court may release or set bail for a defendant who is found to be IST but not dangerous as a result of a mental disorder. *Id.* § 3-106(b). Mr. Johnson therefore reads HG §§ 10-708(g)(3)(i)(2) and (ii)(2) as authorizing involuntary medication of a committed IST defendant *only* if the Department or ALJ concludes that, without the prescribed medication, the person is at substantial risk for continued hospitalization due to the continuation of mental illness symptoms that cause the person to be dangerous. We disagree.

In order for a criminal defendant to be committed to a facility for treatment, the criminal trial court must find *both* that the defendant is IST and that the defendant is a danger due to a mental disorder. CP § 3-106(c)(1)(i). As stated above, IST means that the defendant is "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in [his or her] defense." *Id.* § 3-101(f). Clearly, a current diagnosis of mental illness

25

does not necessarily mean that a defendant is incompetent to stand trial. Indeed, research shows that, of those defendants in the United States for whom a pretrial competency evaluation is performed, approximately 20-30 percent are found to be IST. Janet I. Warren et al., *Factors Influencing 2,260 Opinions of Defendants' Restorability to Adjudicative Competency*, 19 Psychol. Pub. Pol'y & L. 498, 498 (2013). However, it surely is the case that most defendants who are found to be IST are unable to understand the nature or object of the proceeding or to assist in their defenses as a result of serious mental illness. *See* Andrew D. Reisner and Jennifer L. Piel, *Mental Condition Requirement in Competency to Stand Trial Assessments*, 46 J. Am. Acad. Psychiatry Law Online 90 (Mar. 2018), http://jaapl.org/content/46/1/86, archived at https://perma.cc/WB34-LM9P (accessed on Aug. 14, 2020) ("The literature indicates that current psychosis is the mental condition most associated with an examiner's opinion that the defendant is incompetent to stand trial. Nicholson and Kugler noted that the correlation between psychosis and incompetence was among the highest obtained in the review. And in a meta-analysis covering 50 years of research, Pirelli et al. found that defendants diagnosed with a psychotic disorder were nearly eight times more likely to be found incompetent than those without such a diagnosis. In addition to poor performance on assessments of psycho-legal ability, psychosis and symptoms reflecting psychopathology were highly associated with findings of incompetence to stand trial.") (footnotes, internal quotations marks, and other citing references omitted).

While a defendant's symptoms of mental illness may cause a criminal trial court to find *both* that the defendant is IST and dangerous, thus leading to commitment to a

26

Department facility for treatment, Mr. Johnson argues that the language of HG § 10-708(g) evinces the General Assembly's intent to give the Department authority to involuntarily medicate only those IST defendants who remain dangerous at the time of the proposed medication. This argument ignores the strong correlation between serious mental illness and a finding of IST, of which we are confident the General Assembly was aware when it enacted HG §§ 10-708(g)(3)(i)(2) and (ii)(2). Thus, by referring in those subsections to "mental illness symptoms" that "resulted in the individual being committed to a hospital" under CP Title 3 (including CP § 3-106(c)(1)(i)), we believe the General Assembly covered not just the mental illness symptoms that led to the criminal trial court's finding of dangerousness, but also the symptoms of mental illness that led to the court's IST finding.

The flaw in Mr. Johnson's interpretation is readily apparent when one imagines a hypothetical defendant who is found IST due to symptoms of one mental illness (for example, delusions caused by psychosis, leading the defendant to believe that his attorney is in league with Satan, *see Sibug v. State*, 445 Md. 265, 272 (2015)) and who is found to be a danger to himself due to symptoms of another mental illness (for example, suicidal ideation resulting from Post-Traumatic Stress Disorder ("PTSD")). Under Mr. Johnson's construction of § 10-708(g)(3), the Department could involuntarily medicate this hypothetical defendant to address the suicidal ideation caused by PTSD but not the delusions caused by psychosis that prevent the defendant from standing trial. We see no support in the statutory language, the legislative history of §§ 10-708(g)(3)(i)(2) and (ii)(2), or any other source, to prevent the Department, in this hypothetical situation, from treating all the mental illness symptoms that resulted in the defendant's commitment to the facility.

27

To the contrary, the first subsection of § 10-708(g) provides that a clinical review panel may approve the administration of medication if "[t]he medication is prescribed by a psychiatrist for the purpose of treating the individual's mental disorder." HG § 10-708(g)(1). That subsection does not limit such treatment to the individual's mental disorder that caused him or her to be found dangerous by the criminal trial court. This militates against reading the phrases "seriously mentally ill" and "mental illness symptoms" in §§ 10-708(g)(3)(i) and (ii) as limited only to the mental illness, or the symptoms of the mental illness, that caused the criminal trial court to find the defendant dangerous. *See Lockshin*, 412 Md. at 276 (explaining that "we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope").

Moreover, Mr. Johnson's reading of the relevant language renders §§ 10-708(g)(3)(i)(2) and (ii)(2) superfluous. Those provisions' neighboring subsections provide for involuntary medication to address mental illness symptoms that "[c]ause the individual to be a danger to the individual or others while in the hospital" and/or "[w]ould cause the individual to be a danger to the individual or others if released from the hospital." HG §§10-708(g)(3)(i)(1), (i)(3), (ii)(1) & (ii)(3). Thus, if the General Assembly only intended to allow involuntary medication where an individual was found to be dangerous, there would be no need to include §§ 10-708(g)(3)(i)(2) and (ii)(2) in § 10-708(g)(3).[11] This

---

[11] Mr. Johnson notes that the legislative history concerning the 2014 amendments to HG § 10-708(g)(3) does not explicitly refer to restoring competency to stand trial as the purpose for adding what are now §§ 10-708(g)(3)(i)(2) and (ii)(2) to the statute. Prior to the 2014 amendments, the statute only allowed involuntary medication, as pertinent here, if "mental illness symptoms … cause[d] the individual to be a danger to the individual or to others." HG §§ 10-708(g)(3)(i) & (ii) (1991). After this Court held in *Department of*

reinforces our interpretation of §§ 10-708(g)(3)(i)(2) and (ii)(2) as authorizing involuntary medication to address mental illness symptoms that led to the IST finding and thereby restore the individual's competence to stand trial. *See, e.g.*, *Johnson*, 467 Md. at 372 (we read a statute as a whole, to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory).

Adopting Mr. Johnson's contrary interpretation of § 10-708(g)(3) would lead to absurd and illogical results, as demonstrated by his own case. During Mr. Johnson's pretrial competency evaluation, Perkins's staff concluded that Mr. Johnson's "paranoia gets in the way of him being competent to stand trial." The July 15, 2019 treatment note reported that, "[e]ven when the delusional nature of his beliefs [was] broached, Mr. Johnson remained incredulous and maintained that paranoia was 'heightened awareness' of his surroundings." After Dr. Robinson provided a competency evaluation concerning Mr. Johnson to the criminal trial court, the court found Mr. Johnson IST on July 17, 2019. For

---

*Mental Health & Hygiene v. Kelly*, 397 Md. 399 (2007), that the phrase "danger to the individual or to others" in the then-current version of HG § 10-708(g)(3) meant only dangerousness within the facility, the General Assembly amended § 10-708(g)(3) to its current form, which refers to danger in the hospital (§§ (i)(1) and (ii)(1)), commitment to the hospital (§§ (i)(2) and (ii)(2)), and danger if released from the hospital (§§ (i)(3) and (ii)(3)). Mr. Johnson observes that the "Background" section of the Fiscal and Policy Note to the 2014 amendments mentions that "[s]ome advocates believe[d] that the definition of 'dangerousness' should be broadened so that the [clinical review panel] may consider whether the patient would pose a danger to the community if released." Md. Dep't of Legis. Servs., Fiscal & Policy Note (Revised), 2014 Legis. Sess. (S.B. 620 Mar. 21, 2014).

Although the Background section does not refer to the new language of §§ (i)(2) and (ii)(2) that added references to commitment under CP Title 3 (and other commitments to a hospital under HG Title 10), we find this absence insignificant. That the author of the Background section chose only to discuss a reason to add the language of new subsections (i)(3) and (ii)(3) does not tell us why the General Assembly also chose to add new subsections (i)(2) and (ii)(2) to § 10-708(g)(3).

29

more than a month following his commitment, Mr. Johnson refused the only treatment that the panel found would be effective to relieve the paranoia and delusions caused by Mr. Johnson's psychotic disorder. Although the ALJ found Mr. Johnson not to be a danger in the controlled environment of the hospital, the ALJ also found that Mr. Johnson's untreated psychotic disorder would cause him to be a danger to himself or others if released from the hospital.

If HG § 10-708(g)(3) does not permit the Department to administer the only effective treatment to Mr. Johnson, Mr. Johnson likely will never be restored to competence, nor will he likely ever reach a point where he will not be a danger to himself or others if released from the hospital (until old age or other health problems incapacitate him). In such a scenario, Mr. Johnson would remain IST and hospitalized or detained indefinitely.[12] That is not a satisfactory state of affairs for a defendant, the alleged victim(s) of the offenses for which the defendant is charged, or the State, which has a compelling interest in bringing the defendant to trial. We do not believe the General Assembly intended

---

[12] We recognize that CP § 3-106(c)(1)(i) provides that a defendant's commitment following a finding of IST shall continue until the court finds the defendant is no longer IST, is not a danger due to mental disorder, or that there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future. If we adopted Mr. Johnson's interpretation of HG § 10-708(g)(3) and prohibited the Department from involuntarily medicating him, presumably the criminal trial court eventually would find that "there is not a substantial likelihood that [Mr. Johnson] will become competent to stand trial in the foreseeable future," CP § 3-106(c)(1)(i)(3), and would end his commitment at Perkins. However, because Mr. Johnson's mental disorder still would render him dangerous outside the hospital, the trial court would not be permitted to set bail or authorize his release on recognizance. *See id.* § 3-106(b).

30

to create a system that allows for such an outcome when it added §§ 10-708(g)(3)(i)(2) and (ii)(2) to the involuntary medication statute.[13]

> 2. <u>The Department and the ALJ Have Jurisdiction to Decide Whether to Involuntarily Medicate a Person Who Is Committed for Treatment as IST.</u>

Mr. Johnson next argues that, due to Maryland's constitutional separation of powers, the Department and the ALJ lack jurisdiction to decide whether to involuntarily medicate individuals who are committed for treatment after being found IST. According to Mr. Johnson, the decision to medicate him "to restore him to competency necessarily involves a finding that he is presently not competent." Mr. Johnson contends that such a finding rests exclusively in the judiciary, not with the Department or an ALJ. Thus, Mr. Johnson argues, to the extent HG § 10-708 authorizes the Department or an ALJ to order involuntary medication to restore a person to competency, the statute violates the separation of powers mandated by Article 8 of the Maryland Declaration of Rights. We again disagree.

---

[13] If we are incorrect about the General Assembly's intent in amending HG § 10-708(g)(3) in 2014, presumably the General Assembly will again amend the statute accordingly. However, we note that the General Assembly did amend § 10-708(g) in 2018, and made no changes to the provisions at issue in this appeal. Notably, the Background section for the Fiscal and Policy Note for that bill referenced *Allmond*, describing our opinion in that case as holding that "the authorization for involuntary medication may only be constitutionally exercised when there is an 'overriding justification,' such as a need to render a committed defendant competent to stand trial." Md. Dep't of Legis. Servs., Fiscal & Policy Note (Revised), 2018 Legis. Sess. (S.B. 361 Mar. 27, 2018). The General Assembly's simultaneous acknowledgment of *Allmond*'s description of competency restoration as an "overriding justification" allowing the constitutional application of § 10-708(g), and omission of any indication that it does not intend to allow involuntary medication for competency restoration in Maryland, seems significant to us.

Article 8 of the Declaration of Rights provides: "That the Legislative, Executive, and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." Thus, it is elementary that none of the three branches of Government may usurp an "essential" function of another branch. *Getty v. Carroll Cty. Bd. of Elections*, 399 Md. 710, 732 (2007); *see also Shell Oil Co. v. Supervisor of Assessments of Prince George's Cty.*, 276 Md. 36, 47 (1975) ("[A]ny attempt to authorize an administrative agency to perform what is deemed a purely judicial function or power, would violate the separation of powers principle.") (cleaned up).

To be sure, "[o]nce the issue of competency is raised, the General Assembly places the duty to determine the defendant's competency on the trial court, in order to ensure that the requirements of due process are satisfied." *Peaks v. State*, 419 Md. 239, 251 (2011); *see* CP § 3-104(a) (requiring the criminal trial court to "determine, on evidence presented on the record, whether the defendant is incompetent to stand trial"). However, under HG § 10-708, the Department and an ALJ do not make a legal determination of competency or the lack thereof. Rather, by the time the Department or an ALJ is deciding whether to involuntarily medicate a person such as Mr. Johnson, a criminal trial court has already determined, as a matter of law, that the individual is IST.

Mr. Johnson observes that, in his case, the trial court's order finding him IST was over 45 days old when the ALJ issued his ruling approving involuntary medication. According to Mr. Johnson, because "competency is not static," but rather is "fluid and liable to change over[]time," a prior determination of IST is not a legally sufficient basis

32

upon which an ALJ may conclude that an individual remains IST and, therefore, needs the medication to be restored to competency. Indeed, Mr. Johnson points to testimony by Dr. Brown before the ALJ that, in Dr. Brown's opinion, Mr. Johnson was not competent to stand trial as of the day of the hearing before the ALJ. According to Mr. Johnson, this demonstrates that the Department and the ALJ did not rely on the criminal trial court's prior IST finding, but instead, based the decision to involuntarily medicate Mr. Johnson on their own current findings that Mr. Johnson was IST.

We see two problems with these arguments. First, Mr. Johnson's attempt to depict the Department and the ALJ as usurping the criminal trial court's role misses the mark. The ALJ explicitly stated that he was not deciding whether Mr. Johnson was IST. To the contrary, the ALJ observed that Mr. Johnson could have requested another competency hearing before the criminal trial court if he believed he had been restored to competency, and that Mr. Johnson had not done so. And we read Dr. Brown's testimony not as making a *legal* determination that Mr. Johnson was still IST, but rather as providing his expert opinion that the symptoms of mental illness which had led the criminal trial court to find Mr. Johnson IST were still present. Tellingly, Dr. Brown's progress note on August 14, 2019 (one day before the convening of the panel) stated that "Mr. Johnson has been adjudicated IST" and reported that the panel was scheduled to meet the following day, "as there is a low likelihood his competency will be restored without treatment and he faces serious charges." We believe it is clear that neither Dr. Brown nor the ALJ made a legal determination that Mr. Johnson was still IST as of the date of the panel or the administrative hearing.

33

Second, nothing in HG § 10-708 requires that the Department secure a renewed finding of IST from the criminal trial court before proceeding with a clinical review panel and/or a hearing before an ALJ. The proceeding to determine whether to involuntarily medicate a person is distinct from the prior determination of incompetence to stand trial, and is not properly considered a critical stage of the criminal proceeding. Mr. Johnson directs us to no authority to the contrary.

If any party believes that a defendant's condition has changed such that he or she has become competent to stand trial, that party can and should immediately file the appropriate report or motion in the criminal trial court. That action will result in the court holding a hearing and making a new determination regarding the defendant's competency. *See* CP §§ 3-108(a)(1)(ii) & 3-106(d)(1)(iii) (the Department must report to the court whenever the Department believes that the defendant is no longer IST; the court must hold a hearing within 10 days after receiving such a report); *id.* § 3-106(d)(1)(ii) (court must hold a hearing within 30 days after filing of a motion by the prosecutor or defense counsel setting forth new facts or circumstances that are relevant to the determination of the defendant's continued commitment). In the absence of such a new determination, and assuming the Department meets the requirements set forth in HG § 10-708, that statute authorizes the Department or an ALJ to order the involuntary medication of an individual who has been committed after a finding of IST.

The General Assembly's placement of authority in the Department and an ALJ to decide whether to involuntarily medicate a person to restore competency is permissible under Maryland's separation of powers. As stated above, the administrative authorities are

34

not determining whether the individual is competent to stand trial, but rather whether involuntary medication is appropriate for treatment of the individual's mental illness and whether the administration of such medication is likely to result in restoration of competency. Treatment for mental illness is a medical decision that requires the exercise of professional judgment. *See Youngberg v. Romeo*, 457 U.S. 307, 321-24 (1982). The General Assembly has left it to the clinical review panel comprised of medical professionals to determine, in the first instance, whether the prescribed medication is medically necessary and likely to restore the individual to competency. It is well within the General Assembly's power to make this legislative policy determination.

Finally, Mr. Johnson notes that, unlike Maryland law, federal law has evolved to require that decisions regarding involuntary medication of IST individuals be made by the federal criminal trial court. Prior to the Supreme Court's decision in *Sell*, the federal Bureau of Prisons ("BOP") promulgated a regulation concerning involuntary medication to restore competency, which allowed a psychiatrist to make the determination whether such medication was necessary to render a detainee competent to stand trial. 28 C.F.R. § 549.43 (1993). After *Sell*, BOP changed its regulation. *See* 73 Fed. Reg. 33957-01 (June 16, 2008); 76 Fed. Reg. 40229-02 (July 8, 2011). Now, in federal criminal cases, absent a psychiatric emergency, "[o]nly a Federal court of competent jurisdiction may order the involuntary administration of psychiatric medication for the sole purpose of restoring a person's competency to stand trial." 28 C.F.R. § 549.46(b)(2). Although BOP certainly was permitted to change its regulation, Mr. Johnson cites no authority for the proposition that it was required to do so. *Sell* does not mandate that a State adopt the same approach as

BOP. Although the General Assembly could follow BOP's lead and require that the criminal trial court (as opposed to a clinical review panel and/or ALJ) make the decision to involuntarily medicate an individual for the purpose of restoring competence, Article 8 does not compel the General Assembly to do so.[14]

## B. The Administrative Process Did Not Deprive Mr. Johnson of Due Process.

Article 24 of the Declaration of Rights and the Fifth and Fourteenth Amendments of the United States Constitution assure Maryland citizens of their rights to both procedural due process and substantive due process. "Procedural" due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Procedural due process ensures that individuals are not subject to arbitrary governmental deprivation of their liberty and property interests by requiring that litigants "receive notice, and an opportunity to be heard." *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 81 (2001); *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 509 (1998) ("At the core of due process is the right to notice and a meaningful opportunity to be heard.") (cleaned

---

[14] In any event, to the extent the ALJ can be thought to exercise a "quasi-judicial" power when the ALJ approves the involuntary medication of an individual solely to restore competency, the statutory grant of this authority in HG § 10-708(l) is not an unconstitutional delegation of judicial authority. It is well settled that "administrative bodies may exercise quasi-judicial authority, which essentially consists of deciding questions of fact and law subject to judicial review." *Reliable Contracting Co., Inc. v. Maryland Underground Facilities Damage Prevention Auth.*, 446 Md. 707, 717 (2016). HG § 10-708(m) provides judicial review of an ALJ's decision to approve the involuntary administration of medication. As discussed above, Mr. Johnson availed himself of the right to judicial review under § 10-708(m).

36

up). We do not decide what constitutes procedural due process in any particular situation by applying rigid formulas. Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334.

"Substantive" due process refers "to the principle that there are certain liberties protected by the due process clauses [of Article 24 and the United States Constitution] from legislative restrictions, regardless of the procedures provided, unless those restrictions are narrowly tailored to satisfy an important government interest." *Allmond*, 448 Md. at 609-10. "One such liberty is 'avoiding the unwanted administration of antipsychotic drugs.'" *Id.* (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)).

As noted above, Mr. Johnson does not argue before us that the ALJ's decision to approve his involuntary medication deprived him of substantive due process. Rather, Mr. Johnson claims that the Department violated his right to procedural due process by following the administrative procedure set forth in HG § 10-708. In Mr. Johnson's view, he can only receive procedural due process if the criminal trial court decides whether to order his involuntary medication to restore competency after holding a hearing in which Mr. Johnson may assert an affirmative defense that he is competent, and in which he has the assistance of his criminal trial counsel.

To determine whether the administrative process set forth in HG § 10-708 afforded Mr. Johnson procedural due process, we weigh three factors: (1) the private interest that is affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or different procedural safeguards; and (3) the State's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement(s) would entail. *Mathews*, 424 U.S. at 334-35. We conclude that, while Mr. Johnson has a significant liberty interest in avoiding unwanted medication, the administrative process set forth in HG § 10-708 adequately mitigated the risk of erroneous deprivation of that interest.

1.  Private Interest

The Department does not dispute that Mr. Johnson has a substantive due process right in avoiding the unwanted administration of antipsychotic drugs. The U.S. Supreme Court and this Court have recognized that the involuntary administration of antipsychotic drugs substantially interferes with a person's liberty, *see Harper*, 494 U.S. at 222; *Allmond* 448 Md. at 609-10, therefore requiring that restrictions on the right to avoid such drugs be "narrowly tailored to satisfy an important government interest." *Allmond*, 448 Md. at 609-10. Indeed, HG § 10-708 "implicitly recognizes" the significant liberty interest to be free from the arbitrary administration of antipsychotic drugs. *Williams v. Wilzack*, 319 Md. 485, 508 (1990).[15] Thus, § 10-708 provides multiple procedural safeguards before the Department may involuntarily administer such medication to Mr. Johnson and others who are similarly situated.[16] We now consider the risk that, notwithstanding those safeguards,

---

[15] As we explained in *Allmond*, "[a] similar interest is recognized in the common law under the doctrine of informed consent—a doctrine that 'follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient.'" *Allmond*, 448 Md. at 610 n.13 (quoting *Mack v. Mack,* 329 Md. 188, 210 (1993)).

[16] Mr. Johnson also contends that his criminal trial rights are implicated by the involuntary medication process set forth in § 10-708. He bases this claim on the same point we rejected above: i.e., he claims that a proceeding to obtain approval for involuntary

the administrative process set forth in § 10-708 may result in the erroneous deprivation of

Mr. Johnson's right to avoid unwanted medication.

## 2. Risk of Erroneous Deprivation of Private Interest

Mr. Johnson argues that there was a high risk of erroneous deprivation of his private

right because: (1) he was precluded in the administrative proceedings from raising an

affirmative defense that he was competent; (2) an ALJ is more likely to misapply the *Sell*

criteria than the criminal trial court; and (3) Mr. Johnson was deprived of access to his

criminal defense counsel during the administrative process.

### a. Competency Defense

Mr. Johnson argues that in order for procedural due process to be satisfied in the

context of the State's effort to restore him to competency, he must be given an opportunity

to be heard, including the opportunity to defend himself by establishing that he is already

competent. Because the ALJ could not determine issues of competency, Mr. Johnson

claims, he was prevented from rebutting the Department's case by presenting evidence that

he was competent to stand trial at the time of the OAH hearing.

As discussed above, the criminal trial court's determination that Mr. Johnson was

IST was binding on the ALJ. If Mr. Johnson believed that he had somehow been restored

---

medication to restore competency requires the trier of fact to make a new finding that the individual is currently IST. If we agreed with Mr. Johnson on this point, we might be inclined to agree with him that the "proceeding to forcibly medicate" him is (like the competency hearing itself) "a critical stage of a defendant's trial." However, as discussed above, the proceeding to determine whether to involuntarily medicate a person who has been found to be IST is materially distinct from the competency hearing. Thus, we do not agree that Mr. Johnson's right to a fair criminal trial is at issue here.

to competency without taking the prescribed antipsychotic medication, his defense counsel could have moved the criminal trial court for another competency hearing. No such motion was filed. Regardless, while the ALJ was not permitted to make a finding on competency, the ALJ was empowered to consider whether the administration of the prescribed medication represented a reasonable exercise of professional judgment and whether, without the medication, Mr. Johnson was at substantial risk of continued hospitalization due to his mental illness symptoms. Dr. Brown testified before the ALJ on these points, and Mr. Johnson's counsel cross-examined Dr. Brown. Mr. Johnson was permitted to introduce any evidence that would have tended to rebut the Department's showing that Mr. Johnson was still suffering from the same symptoms of paranoia and delusions, which had resulted in his commitment. Mr. Johnson produced no such evidence.

Mr. Johnson attributes his failure to request a competency hearing in the criminal trial court, and to rebut the Department's evidence before the ALJ, to the short timeline of the administrative process set forth in § 10-708.[17] However, if Mr. Johnson had believed he was already competent to stand trial, he could have filed a motion with the criminal trial court under CP § 3-106(d)(1)(ii) and then requested a postponement of his OAH hearing pending a ruling on the circuit court motion. If he had wanted to retain his own expert to

---

[17] As stated above, the hearing before an ALJ is required to be conducted within seven days after the clinical review panel's decision. However, a postponement of the hearing may be granted for good cause or if the parties agree. HG §§ 10-708(l)(4), (l)(5) & (l)(6). Within 14 days from the issuance of the ALJ's decision, either the individual or the facility may appeal the ALJ's decision to a circuit court. *Id.* § 10-708(m)(1). The circuit court must hear and issue a decision within seven calendar days from the date the appeal was filed. *Id.* § 10-708(m)(4).

assess his mental illness symptoms and challenge Dr. Brown's findings before the ALJ, Mr. Johnson could have requested a postponement for that reason as well. The record does not reflect any such request by Mr. Johnson. In the absence of any suggestion in the record that Mr. Johnson sought additional time to be able to rebut the Department's contentions before the ALJ or to obtain a new competency hearing before the criminal trial court, we do not find that the deadlines set forth in HG § 10-708 gave rise to a risk that the ALJ would erroneously order Mr. Johnson's involuntary medication.

### b. *Sell* Criteria

As this Court explained in *Allmond*, in order to forcibly medicate an individual to restore competence, the Department must meet the criteria set forth in *Sell v. United States* by showing that (1) an important government interest is at stake, (2) the medication is substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist trial counsel, (3) less intrusive treatments are not likely to achieve substantially the same results, and (4) the medication is medically appropriate. *Sell*, 539 U.S. at 181-82; *Allmond*, 448 Md. at 616.

Mr. Johnson argues that the risk of erroneous deprivation of his private right to avoid unwanted psychiatric medication is high, where an ALJ, as opposed to the criminal trial court, performs the *Sell* analysis. According to Mr. Johnson, the *Sell* analysis "is legally sophisticated and involves issues of competency inextricably intertwined with constitutional trial rights." In support of this assertion, Mr. Johnson relies on the *Sell* Court's comment that "medical experts may find it easier to provide an informed opinion

41

about whether ... particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior" rather than "balance harms and benefits related to the more quintessentially legal questions of trial fairness and competence." *Sell*, 539 U.S. at 182.

We are unpersuaded. First, Mr. Johnson takes the above quote from *Sell* out of context. *Sell* does not hold that involuntary medication hearings must be conducted before a trial court, as opposed to an administrative proceeding. Indeed, at the time the Court decided *Sell*, the relevant BOP regulation did not require federal criminal trial courts to make competency restoration decisions, and the *Sell* Court did not say that due process required courts to do so. Rather, the Supreme Court observed that it would be prudent for a court reviewing an administrative finding that involuntary medication was warranted first to consider whether there was a basis besides competency restoration (such as dangerousness) for the administration of the medication. The Court did not say that such reviewing courts (similar to the ALJ here) are incapable of analyzing the *Sell* factors when such analysis is necessary.[18]

---

[18] Indeed, the Supreme Court has noted that procedural due process does not require that the trier of fact in cases involving medication decisions be law trained or a judicial officer. *See Harper*, 494 U.S. at 231; *Parham v. J.R.*, 442 U.S. 584, 607 (1979). In *Harper*, the Supreme Court indicated that an inmate's interests are adequately protected and, perhaps better served, by allowing the decision to involuntarily medicate to be made by medical professionals rather than by a judge. 494 U.S. at 231.

Second, we have every confidence that an administrative law judge is fully capable of analyzing the *Sell* factors.[19] The Office of Administrative Hearings is independent from the Department and the courts. *See* SG § 9-1605(b) ("An administrative law judge may not be responsible to or subject to the supervision or direction of an officer, employee, or agent engaged in the performance of investigative, prosecuting, or advisory functions for an agency."). The ALJ, like a federal district judge conducting the *Sell* analysis in a federal case, must rely on the expertise of medical professionals to determine if the prescribed medication is substantially likely to restore the individual to competency and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist trial counsel; whether less intrusive treatments are likely to lead to substantially the same results; and whether the medication is medically appropriate. *See Sell*, 539 U.S. at 181-82. Mr. Johnson does not explain why an ALJ is unable to evaluate expert testimony on these topics as well as a criminal trial court. Nor do we see any reason to assume that an ALJ is more likely to arrive at an incorrect determination.[20]

Finally, the other procedural safeguards set forth in HG § 10-708 and pertinent regulations provide further confidence that the outcome of Mr. Johnson's hearing before

---

[19] Notably, as stated previously, Mr. Johnson does not challenge the ALJ's application of the *Sell* factors in this case.

[20] As the Department points out, ALJs make legal determinations based on medical evidence concerning individuals involuntarily committed to a psychiatric hospital, *see* HG §§ 10-613 – 10-617, as well as individuals committed to the Department as not criminally responsible. CP § 3-115; *see Merchant v. State*, 448 Md. 75, 111-12 (2016) (approving of the "comprehensive administrative procedure" set forth in CP §§ 3-114 through 3-118 relating to release or discharge from commitment due to finding of not criminally responsible).

43

the ALJ was no less reliable than it would have been if it had been held in the criminal trial court. Mr. Johnson's hearing before the ALJ was *de novo*, HG § 10-708(l)(6). Mr. Johnson had the right to request representation at that hearing by a lawyer or other advocate of his choice, *id.* § 10-708(i)(4)(ii), and in fact, Mr. Johnson was represented before the ALJ by very able counsel at no cost to him, who continued to represent him before the circuit court, as well as before this Court (along with equally able co-counsel). Rules of procedure applied at the administrative hearing. *See* COMAR 28.02.01 – 28.02.01.27. To that end, the ALJ had powers that are similar to a trial court judge to "regulate the course of the hearing and the conduct of the parties and authorized representatives." COMAR 28.02.01.11A, B. The ALJ stated on the record his findings of fact and conclusions of law that supported his decision to approve Mr. Johnson's involuntary medication. HG § 10-708(l)(8). The ALJ was required to conduct a full, fair, and impartial hearing, and our review of the hearing transcript confirms that the ALJ did so in this case. In addition, HG § 10-708(m) and SG § 10-223(b) provided for at least two levels of judicial review of the ALJ's decision, and Mr. Johnson indeed has availed himself of two appeals of the ALJ's decision, not including his appeal to the Court of Special Appeals that we bypassed with our grant of *certiorari*.

We pause for a moment to further discuss one other important procedural safeguard that the ALJ employed in Mr. Johnson's case. The ALJ applied a clear-and-convincing-evidence standard in his analysis of the *Sell* factors. The ALJ was correct to use this standard, given the significant liberty interest at stake when an ALJ decides whether to order the administration of unwanted medication to restore competency. Use of the clear-

44

and-convincing-evidence standard lessened the risk of an erroneous deprivation of Mr. Johnson's right to be free of unwanted medication. *See United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009) ("A higher standard . . . minimizes the risk of erroneous decisions in this important context."); *accord, e.g.*, *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004); *United States v. Grape*, 549 F.3d 591, 598 (3d Cir. 2008); *United States v. James*, 938 F.3d 719, 720-21 (5th Cir. 2019); *Barrus v. Mont. First Judicial Dist. Court*, 456 P.3d 577, 583 (Mont. 2020); *Cotner v. Liwski*, 403 P.3d 600, 604 (Ariz. 2017); *State v. Lishan Wang*, 145 A.3d 906, 916 (Conn. 2016); *Warren v. State*, 778 S.E.2d 749, 753 (Ga. 2015); *State v. Lopez*, 312 P.3d 512, 529 (Or. 2014). We adopt that standard for *Sell* determinations in Maryland.[21] This holding applies only to the analysis of the *Sell* factors that an ALJ must conduct as part of a hearing to determine whether to involuntarily medicate IST individuals to restore competency.[22]

### c. Access to Criminal Defense Counsel

Mr. Johnson claims the administrative process denied him access to his criminal defense counsel during a critical stage of his criminal proceeding, thereby increasing the

---

[21] At oral argument, the Department offered no criticism of the many decisions of federal and state courts from around the country that have determined the clear-and-convincing-evidence standard must be used in conducting the *Sell* analysis in order to comply with procedural due process.

[22] HG § 10-708(l)(7)(iii) otherwise sets forth a preponderance-of-the-evidence standard for ALJ determinations concerning involuntary medication.

risk of erroneous deprivation of his private rights. Again, however, the hearing before the ALJ was not a critical stage of Mr. Johnson's criminal case.

In any event, there is no evidence that Mr. Johnson was denied access to his criminal defense counsel. Mr. Johnson does not dispute he was notified that he had a right to legal representation at the hearing before the ALJ per HG § 10-708(i)(4)(ii). Mr. Johnson has not explained why he was unable to alert his criminal trial counsel as to the hearing before the ALJ and/or the hearing on judicial review in the Circuit Court for Howard County. If Mr. Johnson or his counsel in this case wanted Mr. Johnson's criminal trial counsel to advise or otherwise assist in the administrative proceedings, there seemingly was no bar to criminal trial counsel doing so.

In addition, the record provides no indication that Mr. Johnson was prejudiced as a result of the absence of his criminal trial counsel from the administrative proceedings. Mr. Johnson's counsel represented Mr. Johnson vigorously. Among other things, she was careful to prevent Mr. Johnson from making a statement in the administrative hearing that could potentially be used as evidence against Mr. Johnson in an eventual criminal trial. In addition, Mr. Johnson's counsel cross-examined Dr. Brown effectively, and argued Mr. Johnson's case well before the ALJ, the Circuit Court for Howard County, and this Court.

3. State Interest

The *Mathews* factors require consideration of the State's interest in medicating Mr. Johnson, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail. *Mathews*, 424 U.S. at 335.

46

Mr. Johnson contends that the Department is an administrative agency, and therefore does not have an interest in prosecuting his criminal case. Although the Department is not the entity of State government responsible for prosecuting Mr. Johnson, we consider the State's interest at this part of the analysis, not the Department's interest. Undoubtedly, the State has a compelling interest in going forward with Mr. Johnson's prosecution for the serious crimes of which he is accused. The record reflects that the only way to fulfill that State interest is to restore Mr. Johnson to competency through the administration of antipsychotic medication.

Mr. Johnson next argues that the State's interest in involuntarily medicating Mr. Johnson would not be impaired if we concluded that the hearing to decide whether or not to medicate him had to go forward in the criminal trial court, as opposed to before the ALJ. While the General Assembly could rewrite HG § 10-708 and CP § 3-106 with the end result being the adoption of a system that duplicates the current federal regime, there would be a cost to the State in doing that. The current system is well known to the Department, the criminal trial courts, the Office of Administrative Hearings, the State's Attorney's Offices, and criminal defense counsel. A wholesale change to the system would be a significant disruption to state government. If we believed that procedural due process required such a disruption, we would not hesitate to invalidate the current regime. However, we believe the procedures set forth in HG § 10-708 sufficiently mitigated the risk of erroneous deprivation of Mr. Johnson's right to avoid unwanted psychiatric medication.

In sum, we hold that the ALJ's order directing the Department to involuntarily medicate Mr. Johnson did not deprive Mr. Johnson of procedural due process. That order

47

expired in November 2019. As stated above, we are not aware of any subsequent clinical review panel finding that Mr. Johnson should be involuntarily medicated to restore his competency to stand trial. *See* note 9, *supra*. Should the Department again conclude that it is necessary to involuntarily medicate Mr. Johnson to restore him to competency, the Department will need to convene another clinical review panel and follow the required procedures set forth in HG § 10-708 and in *Allmond* and this opinion. *Compare Allmond*, 448 Md. at 620.

## IV

## Conclusion

Restoring Mr. Johnson to competency to stand trial is a justification that overrides Mr. Johnson's right to be free of unwanted medication. *Allmond*, 448 Md. at 613. However, before the State may involuntarily medicate Mr. Johnson or any other person to restore competency, the State must comply with requirements of procedural and substantive due process. The General Assembly has created a robust set of procedures to ensure that an individual's right to avoid unwanted medication is not infringed erroneously, starting with a clinical review panel, followed by a *de novo* administrative hearing, which itself is followed by judicial review before a circuit court judge and further review in an appellate court(s). Mr. Johnson availed himself of all of these procedures in this case.

In the administrative hearing, the Department met its burden by clear and convincing evidence to show under the *Sell* factors that involuntary medication was necessary and appropriate to restore Mr. Johnson to competency. The administrative order to involuntarily medicate Mr. Johnson was authorized under HG § 10-708, did not violate

Maryland's separation of powers, and complied with Mr. Johnson's rights to procedural due process.

It is a matter of the utmost seriousness when the State seeks to administer psychiatric medication to a citizen against his or her will. Based on our review of the record, we can say with certainty that the Department, the ALJ, and the Circuit Court for Howard County all took their obligations under HG § 10-708 appropriately seriously and fulfilled their duties under the statute with care.

We affirm the judgment of the Circuit Court for Howard County.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED; COSTS TO BE PAID BY PETITIONER.**
